*Litchfield,*
June,
1827.

Lockwood
*v.*
Sturdevant.

---

## HILLHOUSE *against* DUNNING:

### IN ERROR.

A false and malicious writing, containing an insinuation that the plaintiff has been guilty of perjury, is libellous.

So, a false and malicious writing, which renders a person contemptible and ridiculous, or which induces an ill opinion of him, is libellous.

Therefore, where the writing complained of described the plaintiff as a low, Indian-like fellow; contrasted him with Sergeant *Dunning*, nicknaming him "Counsellor *Dunning*, of *Weewalker*, Sergeant at law;" represented his testimony on the trial of a certain cause, as wrapped in concealment—a fictitious tale, too absurd to be endured—a contrived story—a mere pretence, designed, by its falsehood, to blast the truth, and render infamous the fairest characters in society, and more dangerous than a concealed serpent; stigmatized the plaintiff as a base villain, and a slavish dependent of the person for whom he testified,—a mere stupid puppet in his hands, trained and instructed how to testify, having no answer to give, on cross-examination, but prevarication and *non mi ricordo ;* it was held, that such writing was libellous.

Where there is an introductory averment, in an action for a libel, that the words were used in a certain sense, or in relation to a certain subject, neither their meaning nor application can be varied by *innuendo*.

This was an action for a libel, brought by *Dunning* against *Hillhouse*. The declaration, after averring the former good character of the plaintiff, proceeded as follows : "And before the committing of the grievances, by the defendant, hereinafter stated, a certain suit or petition had been depending before the honourable superior court, holden in and for *Fairfield*

6  391
67  513

county, wherein one *Daniel Beers* was the petitioner, and one *John L. Broome*, respondent, and which had been then lately tried before said court; and on such trial, the plaintiff had been and was examined on oath, and had given evidence as a witness on behalf of the petitioner, on the trial aforesaid. Yet the defendant, well knowing the premises, but contriving to injure the plaintiff in his good name, and to destroy his reputation, and with the malicious intent to cause it to be believed, by his friends and the public, that he had committed perjury, and that he was base, wicked and corrupt, and with the like intent to render him infamous, and to expose him to public hatred, contempt and ridicule, did, on or about the 31st of *May*, 1822, falsely and maliciously compose and publish, and procure to be published, a certain false, malicious and defamatory libel, being a pamphlet, entitled "The three Witnesses," containing, amongst other things, the false, malicious and libellous matter following, of and concerning the plaintiff, and of and concerning the said petition, wherein said *Beers* was petitioner and said *Broome* respondent, and of and concerning the evidence given on the trial of the same as a witness aforesaid—that is to say,

[*Specification 1st.*] "Yet the gentleman would persuade the court to credit the story (meaning the evidence of the plaintiff,) that without any injunction of secrecy, days before a sweeping assignment was to be made, Mr. *Hawley*, (meaning one *Isaac Hawley*) disclosed his situation and intention to *Cyrus Dunning*, (meaning the plaintiff) a petty tenant of a petty mansion of his at *Weewalker* brook. And that he (meaning said *Hawley*) selected him (meaning the plaintiff) as his "confidant and legal adviser."—We (meaning the defendant) have heard of Counsellor *Dunning*, of *King's Bench*, in *England*, otherwise called Sergeant *Dunning ;* but we had not before heard of Counsellor *Dunning* (meaning the plaintiff) of *Weewalker*, Sergeant at Law," (meaning that the story of the plaintiff as a witness aforesaid, was false, and that the plaintiff ought to be called and nicknamed Counsellor *Dunning*, of *Weewalker*, Sergeant at Law, by way of reproach and ridicule, and for the purpose of rendering him contemptible and despicable.)

[*Specification 2d.*] "The testimony of *Dunning* is wrapt in concealment, (meaning that the evidence of the plaintiff on the trial aforesaid was 'falsely and corruptly given.) The above disclosure of Mr. *Hawley's* situation is made to no person living but Counsellor *Dunning*; (meaning the plaintiff, by way of

reproach and ridicule.) Here is the same attempt at conceal-ment (meaning that the plaintiff, as a witness, had falsely and corruptly concealed the truth, and that the evidence of the plaintiff as a witness aforesaid was wilfully false and corrupt,) and to impose *Dunning* (meaning the plaintiff) on the court as the sole confidant of Mr. *Hawley*, (meaning that the plaintiff's said evidence was wilfully false, and an imposition on the court.) It is Counsellor *Dunning* still, (meaning the plaintiff, by way of reproach and ridicule.) It is impossible that all this should pass in the room, and no one hear any thing of it, unless *Dunning* (meaning the plaintiff) had some mysterious mode of communication, which others could not comprehend, (meaning that the story of the plaintiff, as a witness aforesaid, was impos-sible, and wilfully and maliciously false and corrupt.) What is still more singular, Mr. *Hawley* testifies, that no such com-munication was made. Mr. *Platt*, (meaning one *Newton Platt*) also testifies, that no such directions or instructions were giv-en by him, as are testified to, by *Dunning*, (meaning the plain-tiff.) *Dunning* (meaning the plaintiff) must, then, if what he (meaning the plaintiff) pretends is true, possess the power of communicating with others, without even the knowledge of the persons with whom he holds the communication. On this sup-position he must be a magician indeed, (meaning that the plaintiff had wilfully, maliciously and corruptly testified falsely, in his evidence aforesaid.) How does the subsequent con-duct of this courier of dispatch, this *Phillipides* (meaning the plaintiff) comport with his present pretensions? Had he been directed to go on an urgent embassy to secure the horses, swine, &c. he would have proceeded to execute his commission with-out delay; yet we find him loitering at the house of Mr. *Platt*, till the completion of the writings, the execution of the deeds, the departure of Col. *Hawley*, and to the end of the chapter. The tale (meaning the evidence of the plaintiff aforesaid) is too absurd to be endured; and we (meaning the defendant and the community at large) must be stupid indeed, not to perceive, that this whole story of his (meaning the plaintiff) being di-rected to go to the farm, &c. (meaning the story which the plaintiff had told as a witness on the trial aforesaid) was mere-ly contrived to give a specious colouring to his pretended in-structions respecting the recording of the deeds, (meaning that the plaintiff had wilfully, and wickedly, and maliciously con-trived and invented a story, which he knew to be false, and had

*Fairfield,*
June,
1827.

Hillhouse.
*v.*
Dunning.

corruptly and maliciously testified falsely to the same, as a witness, on the trial of said petition of *Beers* against *Broome ;* and that one part of his said evidence on the trial aforesaid, was thus falsely, maliciously and corruptly given, for the purpose of giving effect and force to other false, malicious and corrupt evidence by him given as a witness aforesaid, on the trials aforesaid, relating to his instructions respecting the recording of deeds, and that the plaintiff had been guilty, in giving his evidence as a witness on the trial aforesaid, of wilful and corrupt perjury.)

[*Specification 3d.*] " This is a most astonishing attempt, (meaning the trial of said petition.) It is an attempt to obtain, on the oath of *Dunning*, (meaning the plaintiff ) a wholesale commission of infamy against the fairest characters in society, (meaning that the plaintiff was bribed and corrupted to procure, by his oath, on the trial of said petition, the fairest characters in society to become infamous.) Shall character, shall all that we most fondly appreciate, fall before their (meaning the plaintiff's) overbearing attacks ? By their superlative agency, shall *Dunning* (meaning the plaintiff ) and the Goblin Hearsay, like the dread Upas, blast every thing that comes within the sweep of their contaminated atmosphere ? Or shall the sunbeams of truth, dissolve and dissipate their poisoned effluvia (meaning that the plaintiff, on his oath, had wilfully and corruptly given false testimony on the trial of said petition, and was guilty of wilful and corrupt perjury in giving his evidence on said trial, and was contaminated and poisoned with corruption, falsehood, vice and infamy.)

[*Specification 4th.*] " And who is *Cyrus Dunning*, (meaning the plaintiff) at whose breath the most spotless reputation must wither ? Is he a man, who, in extensive mercantile and other concerns, has established a general reputation for integrity ? Has he been noticed in the appointments of the community, in which he lives ? By the faithful discharge of the duties of these appointments, has he passed the ordeal of public approbation ? Or is he one, who may be indebted to the circumstance that he is not known, for a negative credit ? We do not subscribe to the doctrine of the *Apostolic Romish Church*, that ignorance is the mother of devotion, nor to that which is now attempted to be inculcated, that because a man is little known, he is to be implicity confided in, and that obscurity is the surest criterion by which we are to judge of the credit to be attached to the

testimony of a witness. The heart of man (meaning the plaintiff) is deceitful above all things, and desperately wicked, who can know it. The wicked (meaning the plaintiff) walk in disguise. The wicked, (meaning the plaintiff) as well as men of modest worth, avoid observation. The crooked paths of the former, which often wind in the vales of obscurity, are less liable to detection, and more to be dreaded, than when exhibited to the blaze of public scrutiny. Serpents are more dangerous, when concealed, than when exposed to view ; (meaning that the plaintiff, as a witness aforesaid, in giving his evidence, on the trial aforesaid, was destitute of integrity, and was obscure and ignorant, and that as such witness, in giving his evidence on the trial aforesaid, his heart was deceitful above all things, and desperately wicked, and that as such witness, he had wickedly, wilfully and corruptly testified falsely, and that he was a wicked man, who walked in disguise, and avoided observation : And that he was to be avoided and dreaded as a wicked and dangerous man, that could not be detected, and that he was dangerous as serpents concealed.)

[*Specification 5th.*] " *Dunning* (meaning the plaintiff) appears to have been a villain regardant to those who have been in possession of the premises from time to time. He occupied a small tenement under Mr. *Hawley.* He did the same under *Minor ;* and has been the tenant of the petitioner (meaning said *Beers*) since he obtained possession (meaning that the plaintiff was a mean and base slave, and the personal property of every person, who owned or possessed the land on which he lived.)

[*Specification 6th.*] " He (meaning the plaintiff) is, moreover, brother-in-law to *Isaac Babbit,* who derives his title from *Minor, Terrill* and *Babbit,* are interested in having the present respondent foreclosed, and that he should be obliged to redeem, as their demands would thereby be secured. *Dunning* (meaning the plaintiff) then, testifies for his landlord, for his brother-in-law, and to secure himself in his possession. In addition to all this, if his instructions were not such as he pretends, he practised a fraud in procuring the deeds to be thus recorded. In doing this, it may be presumed he had some sinister design, notwithstanding his pretence to Mr. *Platt.* He (meaning the plaintiff) who, from any undue motive, would practice a fraud, would probably, from the same motive, testify in such a manner, as to screen himself, and if possible, to justify what he had done. That his (meaning the plaintiff's) in-

*Fairfield,*
June,
1827.

*Hillhouse*
*v.*
*Dunning.*

structions were to have the deeds recorded at the same time, is not only proved by the testimony, but evinced by the subsequent conduct of *Dunning,* (meaning the plaintiff) and of all the parties (meaning that the plaintiff had, from base and depraved motives, been guilty of fraud, and falsehood, and fraudulent conduct relative to getting certain deeds recorded, and had, on said trial of said petition, from the same motives, wilfully, corruptly and falsely testified, for the purpose of justifying himself in said fraud, falsehood and fraudulent conduct.)

[*Specification 7th.*] " In the trial of the cause of *Beers* &c. v. *Hawley* &c. (meaning the petition in which one *Daniel Beers* and *Philo Booth* were petitioners, and said *Hawley* and others respondents) when *Beers* (meaning the petitioner, *Daniel Beers*) had determined to postpone *Wright,* (meaning one of the respondents to said petition) *Dunning* (meaning the plaintiff,) is prepared to testify. Then, and not till then, he (meaning the plaintiff) comes forward with his pretended instructions, and with the story of his secret communications with Mr. *Hawley,* Mr. *Platt,* &c. &c. Such absurdity, inconsistency and duplicity ought to discredit the testimony of any witness, (meaning that the plaintiff as a witness on the trial of said cause of said *Beers* and *Booth* against *Hawley* and others, in giving his evidence in said case, was guilty of absurdity, inconsistency and duplicity, and that he was then prepared to testify, and did then and there testify falsely and maliciously, and was guilty of wilful and corrupt perjury.)

[*Specification 8th.*] " And then like *Cyrus Dunning,* (meaning the plaintiff) he (meaning another witness in said cause, one *Truman Minor*) went on with I don't know, or *non mi ricordo,* to the end of his lesson. From the frail recollection of these witnesses, in many particulars, (meaning the witnesses, of which the plaintiff was one) a stranger might suppose, that they (meaning the plaintiff and another) were of *Italian* pedigree. It is truly said, by *Solomon,* the way of transgressors is hard. While a man strictly follows the line of integrity, the consciousness of his own rectitude supports him, and all is calm and serene. When he suffers himself to be tolled and enticed from the right way, he is involved in a labyrinth of perplexity, is reduced to the necessity of prevaricating, and sinks in the mire of impurity (meaning that the plaintiff, as a witness on the trial of said cause of said *Beers* against said *Broome,* was destitute of rectitude and integrity, and had suffered himself to be brib-

ed and enticed to violate his duty as such witness, and wilfully to give false evidence ; and as such witness, was guilty of prevarication and falsehood, and had maliciously been guilty of wilful and corrupt perjury, in the giving of his evidence on said trial, and was sunk in the mire of impurity, by reason of his wilfully false and corrupt testimony in said cause, and that he was base, degraded and depraved, and sunk in impurity and vice.)

[*Specification 9th.*] "We (meaning the defendant) would here notice more particularly the master of the exhibition, (meaning the petitioner aforesaid,) by whose hand the machinery is put in motion, and the puppets (meaning the plaintiff and said *Truman Minor,*) prepared to act their part ; for can we consider that self-stultifier *Minor* and the *Weewalker Sergeant* (meaning the plaintiff) in any other light ? (meaning that the plaintiff should be called and nicknamed, a puppet, and the *Weewalker Sergeant,* by way of obliquy, reproach and ridicule, meaning thereby, and intending to have it so understood, and believed, that the plaintiff, as a witness aforesaid, on the trial aforesaid, was induced and bribed by the petitioner in said cause, wickedly and wilfully and corruptly to testify falsely, and did, as such witness on said trial, in giving his evidence aforesaid, wickedly, wilfully and corruptly testify falsely, and was then and there guilty of wilful and corrupt perjury.)

[*Specification 10th.*] " Instead of holding the language, which he (meaning the said *Beers,* the petitioner in said cause) before held, he makes an arrangement with *Minor,* and instructs him, poor soul, to stultify himself, and to besmear his own character. He (meaning the said *Beers*) trains the slow-paced *Dunning* (meaning the plaintiff) for the heats, (meaning that the plaintiff should be called the "slow-paced *Dunning*" by way of reproach and ridicule, and to render him contemptible and ridiculous, and that he was trained and induced, and suborned to give, and did give, evidence, as a witness, on the trial of said petition of *Beers* against *Broome,* which was wilfully and maliciously false and untrue, and that he was guilty of wilful and corrupt perjury in giving his evidence as aforesaid : By means of the committing of which grievances by the defendant, the plaintiff hath been injured in his reputation, and subjected to infamy, contempt and ridicule among his neighbours and acquaintance, and otherwise greatly injured."

The cause was tried, on the general issue, at *Fairfield, De-*

*Fairfield,*
June,
1827.

Hillhouse
*v.*
Dunning.

*cember* term, 1824, before *Peters,* J. ; and the plaintiff obtained a verdict.   On motion of the defendant, the record was transmitted to this Court, for revision ; the insufficiency of the declaration being assigned for error.

*W. Hillhouse* and *N. Smith,* for the plaintiff in error, contended, 1. That under this declaration, no recovery could be had, for an imputation of *perjury ;* because, in the first place, there is no direct charge of it in the writing, and no facts and circumstances are stated, amounting to a legal designation of that crime ; secondly, it is not averred what the issue was, nor shewn by a proper averment of facts, that the testimony of the plaintiff was material to such issue ; thirdly, it does not appear where the trial was had.   *Stark. on Sland.* 292. *Am.* ed.   *Holt on Lib.* 189.   *Bul. N. P.* 9.   Every fact to which the writing is claimed to refer, expressly or by implication, must be introductorily averred.   Sir *Richard Snowde's* case, *Cro. Car.* 321. *Slocum's* case, *Cro. Car.* 442.   *Holt* v. *Scholefield,* 6 *Term Rep.* 691.   *Brown* v. *Mitchel, Cro. Eliz.* 500.   *The King* v. *Alderton, Sayer* 280.   *Hawkes* v. *Hawkey,* 8 *East* 427.

2. That if the words do not amount to an imputation of perjury, they are not actionable.   In examining the several specifications, it is to be borne in mind, that the innuendoes are of no avail, except so far as they refer to facts previously averred ; an innuendo being a mere instrument of reference, which can have no effect, where that which it purports to refer to, has not been averred.

As to the 1st specification ; it does not appear, that the words, which it complains of, imputes even a falsehood to the plaintiff.   The story, or evidence of the plaintiff, is left on the mere statement of it, without a single allegation that he did not give such evidence, or that it was not true.   If the statement has the stamp of improbability or ridicule, the defendant is not answerable for it.

In the 2nd specification, there is a fatal omission.   " It is impossible that *all this* should pass in a room," is a relative term, and imports that what did pass in the room had been before stated ; but the plaintiff has so garbled the publication as to leave this out of sight.   If the declaration, by the omission of any part of the publication, alters or affects its import, it is fatal.   *Tabart* v. *Tipper,* 1 *Campb.* 352, 3.   There is no previous averment to warrant the implication, that the plaintiff tes-

tified to what did pass in the room.    The attempt at "conceal-ment," spoken of in the beginning of this specification, is appli-ed to the counsel, and not to the plaintiff.    The writing states, that Mr. *Hawley* and Mr. *Platt* contradicted what the plaintiff testified to, respecting a certain communication, and respecting certain directions and instructions.    This, after quoting what is then stated, the plaintiff says, means, that he testified falsely in his evidence aforesaid; which must refer to what is stated and quoted as his evidence.    It appears, then, on the record, that both Mr. *Hawley* and Mr. *Platt* testified, that no such com-munication was made, or directions or instructions given.    How is it possible to reconcile this contradiction of testimony?    If what the plaintiff pretended, was true, the other witnesses must have wilfully testified to what was false, or they must have been under some strange delusion.    The manner in which this con-tradiction of the witnesses is attempted to be accounted for, partakes more of forbearance than of malignity.    Saying that if what the plaintiff pretended was true, he must have had some mysterious mode of communication, can be considered as noth-ing more than a denial, that his pretensions were correct, and that the other witnesses had testified to what was false, and were guilty of wilful and corrupt perjury.    The innuendoes in this specification, are not warranted by the writing set forth, or by any introductory averments in the declaration.

That the "attempt" spoken of, in the 3rd specification, was meant to be applied to the opposing counsel, and not to the plaintiff, is evident from the context, and from the bearing of the argument, the amount of which was, that on the trial, the gentlemen urged the testimony of the plaintiff to an unheard of and alarming extent, and appeared determined to prostrate eve-ry thing to effect their object.    It was this perversion or unwar-rantable abuse of testimony, which, throughout the whole of this specification, the writer was attempting to controvert and correct.    The innuendoes in this specification, are equally un-warranted.

The 4th specification is a continuation of the argument claim-ing that the plaintiff's testimony was entitled to such unqualifi-ed credit as to outweigh the testimony of the other witnesses, and the mass of evidence to which it was opposed.    The suc-ceeding parts of this specification are meant to controvert pro-positions as dangerous to morals as they are to the administra-tion of justice, *viz.* that because a witness is little known, he is

*Fairfield,*
June,
1827.

Hillhouse
*v.*
Dunning.

*Fairfield,*
June,
1827.

Hillhouse
*v.*
Dunning.

implicitly to be confided in, and that obscurity is the surest pass- port to credit. To prove the general proposition, that human depravity pervades every class of society, the passage of inspi- ration was adduced. The absurd innuendoes, that by the "heart of man," was meant the plaintiff's heart, and by the "wicked who walk in disguise," and "who avoid observation," was meant the plaintiff, are a total perversion of what they profess to explain, both as it respects the grammatical construction, and the obvious meaning of the passage. All the writer's proposi- tions in this specification, are strictly and morally true ; and not a single innuendo, which the plaintiff has introduced, gives the sense of the words.

As to the 5th specification ; it is well known, that a freeman might be "a villain regardant ;" and nothing more was meant by the term,than that the plaintiff was successively the tenant of the several owners of the property. This is explained to be its import, by what follows,—that he occupied a small tenement under Mr. *Hawley ;* that he did the same under *Minor ;* and has been the tenant of Mr. *Beers* since he obtained possession.

The 6th specification claims, that the plaintiff's relationship to *Babbitt,* one of the parties in interest, to whom he was broth- er-in-law, and his connexion with *Beers,* the plaintiff, to whom he was a tenant, ought to be taken into consideration, in weigh- ing his testimony. It then states, that if the plaintiff's instruc- tions were not such as he pretended, he practised a fraud in procuring the deeds to be thus recorded ; and that in doing this, it might be presumed he had some sinister design. In confir- mation of this natural and reasonable presumption, it is added, that he, who, from any undue motive, would practise a fraud, would probably, from the same motive, testify in such a man- ner as to screen himself, and, if possible, to justify what he had done. The whole of this passage is hypothetical. If the plain- tiff had acted improperly respecting the recording of certain deeds, it certainly might be presumed, that he had some sinister design in doing it ; and it might certainly be alleged as a proba- ble consequence, that he who, or any one who, had thus prac- tised, would thus testify. Is it not probable, that he would be under a bias so to testify ? And had not Mr. *Broome,* or any one for him, a right to claim, that such a circumstance, if it existed, ought to be taken into consideration, in weighing the testimony ? This is all that is done ; for saying that there is *evidence* of a fact, is not an assertion of the fact, and has never

been so considered,   The concluding innuendo in this specifi-
cation is liable to the objection, that it refers to extrinsic facts,
and to the plaintiff's testimony respecting those facts, without
any introductory averments of the facts, or of the testimony.

The words "prepared to testify," in the 7th specification,
connected with what appears on the record, evidently mean no
more than that the plaintiff was brought forward, at the time
of the trial, to make his disclosures.   That he should keep the
secret communications with Mr. *Hawley*, and the instructions
which he pretended to have received, concealed for years, un-
til called upon at this particular crisis, was a circumstance pro-
perly taken into consideration, in weighing his testimony.   The
absurdity and inconsistency of his story consisted in the pre-
tence, that Mr. *Hawley* should make these disclosures to him,
and to no one else ; and that these, and certain directions and
instructions, which he claimed to have received, should be made
to him in a room, in the presence of others ; and that neither
they, nor Mr. *Hawley*, nor Mr. *Platt*, should have any knowl-
edge respecting them.   That a witness has concealed, for years,
facts, which, to say the least of them, are improbable, is always
viewed, unless there are reasons for the concealment, as an in-
dication of duplicity, or want of that frankness and candour,
which usually mark the intercourse of mankind.   These, and
the various other circumstances, which have been noticed, have
always been considered as proper to be urged ; and the defen-
dant had a right to urge them, as circumstances which went to
impair the testimony of the plaintiff.

The 8th specification is made up of mutilated selections,
which renders it impossible for the court to understand the true
import of the passages, and is a ground of non-suit or arrest,
according to the principle laid down, by Lord *Ellenborough*, in
*Tabart* v. *Tipper*, 1 *Campb.* 353.   The disgraceful dilemma, to
which the *Italian* witnesses were reduced, by refusing to an-
swer frankly, and by resorting to that stop-cock to inquiry *non
mi ricordo*, to which witnesses, who are not willing to answer,
too often resort, brought to mind the saying of *Solomon ;* and
the abstract observations which follow, were fully justified as
moral conclusions, by their truth, and by what took place on
the Queen's trial.   There was nothing libellous in this.   *Star-
kie* and other writers state the law to be, that a writer may in-
troduce abstract observations, without being liable to prosecu-
tion.   The concluding innuendo in this specification, is not

justified by the words, or supported by any introductory averment that the defendant meant to charge the plaintiff with being bribed.

The burden of the 9th specification is, that the plaintiff is called "*the Weewalker Sergeant*," and "a *puppet*." This is said to be *reflecting*. Should one of our learned opponents be called Sergeant, it would not be libellous, because there is nothing improbable in the supposition, that Mr. *Hawley* should have selected him as his legal adviser. If there is any thing ridiculous in the term Counsellor or Sergeant, as applied to the plaintiff, it arises wholly from the absurdity and improbability of the supposition, that Mr. *Hawley* should, on this occasion, have selected him as his confidant and legal adviser, according to the story or evidence of the plaintiff; and he has, therefore, no right to complain of the appellation, or of its repetition. But he is called the *Weewalker* Sergeant. Although *Weewalker* is claimed, by the innuendo, to be an *Indian* name, there is nothing libellous in designating it as the place of the plaintiff's abode, as it actually was; nor is its *Indian* character any reproach. There is nothing very criminal in comparing law-suits to puppet-shows, between which there is, in some respects, perhaps too striking a resemblance. The writing does not assert, that the plaintiff was a puppet. The inquiry is merely made, whether from the evidence and exhibits, he could be considered in any other light. This is, at most, an intimation of the writer's opinion, with a reference to the foundation of it. It falls far short of an assertion of the fact, and is not libellous. It is not possible to torture language so as to make the passage in question bear the construction ascribed to it, by the innuendo.

The 10th specification complains, that the defendant called the plaintiff "*slow-paced*," and said he was "*trained for the heats*." It is no more libellous to call a man *slow-paced* than *slow-speeched*—*single-paced* than *single-speeched*. A distinguished member of the *British* Parliament, was uniformly called "*single-speeched Hamilton;*" and it was never considered as reproachful. It is no more criminal to apply the term "heats" to a contest at the bar, than at the polls. It is frequently published of those who are held up for office, and even for the presidency, that they have entered for the *heats*. Besides, these expressions were warranted, by what appears on the record. The terms *slow-paced* and *the heats*, are used with

reference to, and for the purpose of exposing, the plaintiff's story, as it is detailed in the 2nd specification. Such a witness ought not to complain of being called *slow-paced*. The import of the passage is, that the conduct of the plaintiff was totally inconsistent with his pretended mission, in the execution of which no step appears to have been taken. Perhaps there is no more effectual mode of counteracting such pretensions, than by exposing them to ridicule, if they be ridiculous; as was said by Lord *Ellenborough*, in the case of Sir *John Carr* v. *Hood*, 1 *Campb.* 355. n. As to the *training* ;—saying that he "*trains* the slow-paced *Dunning* for the heats," is a figurative expression, and implies merely, that he prepared him, who, according to his own story, is not very rapid in his movements, for the legal race; or, in plain language, prepared him to testify. This does not imply, that he testified improperly.

It is a consideration of great weight, applicable to the whole case, that the remarks on which this suit is founded, were made in examining legal proceedings, and scrutinizing testimony. Every man who testifies in court, commits himself and his testimony to the judgment of the public. If any one who comments on it, does not step aside from the subject, or introduce falsehood, for the purpose of condemnation, he exercises a fair and legitimate right. Had the defendant followed the plaintiff into private life, for the purposes of slander, that would have been libellous; but no passage of that sort appears, and even the allusions do not affect the plaintiff otherwise than in relation to his testimony. Others have a right to pass their judgment on it; to censure it, where it is censurable; and to subject it to ridicule, if it be ridiculous. Nothing can be more threatening to the liberty of speech, the liberty of the press, and to a correct administration of justice, than to beset with suits a free discussion of testimony. The *English* courts, with all their trammels, which do not exist in this country, admit the right of any one to publish what has been exhibited in a judicial proceeding. *Curry* v. *Walter*, 1 *Esp. Rep.* 457. S. C. 1 *Bos. & Pull.* 525. *The King* v. *Wright*, 8 *Term Rep.* 293. *The King* v. *Stockdale*, 1 *Ridg.* 343.*

3. That the defects of the declaration are not cured by verdict. The sense of the writing cannot be extended, by innuendo, without averring such facts and circumstances as war-

---

* *Ridgeway's* speeches of the Hon. *Thomas Erskine.*

*Fairfield,*
June,
1827.

Hillhouse
*v.*
Dunning.

rant the extension ; and in no case will the entire want of aver-
ment, be cured by verdict.    This is familiar law.

*Sherman,* for the defendant in error, insisted, 1. That the
declaration contained all the introductory averments, necessa-
ry to show, that the words of the writing were used in a libel-
lous sense.    It is distinctly averred, that a certain suit or peti-
tion had been depending, and had been then lately tried, before
the superior court in and for *Fairfield* county, wherein one
*Daniel Beers* was the petitioner, and one *John L. Broome* was
the respondent; that on such trial, the plaintiff had been ex-
amined on oath, and had given evidence as a witness, on be-
half of the petitioner;  that the defendant, well knowing this,
with a view to injure the plaintiff in his good name, and to des-
troy his reputation, and with the *malicious intent* to cause it to
be believed, that he *had committed perjury*, and that he was
*base. wicked* and *corrupt*, and with the *like intent,* to *render him
infamous,* and to *expose him to public hatred, contempt* and *ridi-
cule,* did, on the 31st of *May,* 1822, compose and publish a cer-
tain *false, malicious* and *defamatory* libel, specifying it by its
title; and that such libel, among other matters, contained the
words set forth in the declaration *of and concerning the plain-
tiff,* the said *petition* and the *evidence* given on the trial.    Here
are introductory averments sufficient to support any innuen-
does in the declaration ascribing to the words an imputation of
*perjury ;* of *baseness, wickedness* and *corruption ;* of being *infa-
mous ;* the object of *public hatred, contempt* and *ridicule.*    A
judicial proceeding in a court of record, is shewn ; in which, it
is averred, that the plaintiff was examined, as a witness, under
oath, and, it is also averred, that the words related to this trial, to
him and his testimony ;  and that they *were malicious* and *false.*
The general rule laid down by *Starkie,* is, that where facts ex-
trinsic of the words and of the plaintiff's character, are neces-
sary to support the action, the plaintiff must aver, that the
publication was made in reference to those facts.    *Stark.
Sland.* 292.    Are not " the extrinsic facts" averred in this dec-
laration, sufficient to support the action—provided the words
themselves will bear the meaning ascribed to them ?

2. That the charges made by the defendant, as set forth in
the declaration, amount to an imputation of *perjury.*    This is
apparent not only from the expressions used, but from the
whole object and drift of the writing, which was, to shew, that

the cause was decided wrong on the merits ; and this by the testimony of the plaintiff. This must have been, of course, in a point material. It is not necessary, for the plaintiff's purpose, to show, that the words *necessarily* impute perjury : for if they are susceptible of this construction, the finding of the jury settles this point.

*Faiifield,*
*June,*
*1827.*

Hillhouse
*v.*
Dunning.

3. That if the words set forth in the declaration fall short of a charge of perjury, and, if they would not, if uttered without writing, support an action of slander, yet being written and published, they are libellous, as containing an insinuation of perjury, and imputing gross prevarication, corruption and moral pollution. Almost every specification contains somewhat of these charges, but they are seen more prominently in the 3d and 8th. Whatever apparent confusion there may have been, in early times, among cases of verbal and written slander ; whatever doubts may have been thrown out, at a later period, as to the propriety of any distinction ; and whatever there may be of conjecture as to the origin of such a distinction ; it is unquestionable, that a settled and well defined distinction now exists. It is founded principally on the *deliberation*, the *permanency* and *extended circulation* of written slander, as contradistinguished from the *sudden excitement*, the *transitoriness*, and the *limited range* of oral aspersions. *Holt* on *Lib.* 222. *Stark.* on *Sland.* 126. & seq. That an *insinuation* of perjury, written and published, is libellous, was decided in *Stiles* v. *Nokes*, 7 *East*, 493. There, the charge was simply, that the the plaintiff had sworn to a violent assault upon himself, by *A. B.*, when it clearly appeared from the testimony of every other person in the room, that no violence was used by *A. B.* The writing did not assert, that what the plaintiff swore to, was *false* ; much less, that it was *wilfully* false. The court of *King's Bench* admitted, as every reasonable man will, that it might have appeared by the testimony of every witness in the room, that no violence was offered by *A. B.*; and yet the plaintiff might not have been guilty of perjury ; still it was held, that this was a libellous insinuation. Charges, which impute *moral turpitude* to a party, are considered among the clearest cases of libel. *Holt* on *Lib.* 221, 223. To write and publish of a man, that he is a *dishonest* man, is libellous. *Austen* v. *Culpepper.* *Skinner*, 124. *Stark.* on *Sland.* 133.

4. That the writing complained of is libellous, as calculated to *reproach, disparage* and *ridicule* the plaintiff, and to render

*Fairfield,*
*June,*
*1827.*

Hillhouse
*v.*
Dunning.

him *contemptible* in society. *Stark.* 133, 4. *Holt*, 221, 223, 4. 226. Most of the passages set forth in the declaration, will not only bear this construction, but will admit of no other. If this be not their drift and tendency, they are without meaning.

5. That, at any rate, the writing is *reflecting ;* which is sufficient to make it libellous. *Holt* 224.

6. That the defendant cannot shield himself from liability, in this action, on the ground, that his charges relate to what took place in a court of justice. Counsel and witnesses, in the regular course of the administration of justice, have a special privilege of uttering matter injurious to the character of individuals. Were the law otherwise, it would impair the means of investigating truth. Even this privilege, however, has its checks. The observations made, must be pertinent to the question on trial ; they are exposed to the animadversion of the opposing counsel, are subject to the immediate controul of the court ; and are finally to be taken into consideration, by the jury, who have an opportunity to decide how far; they are founded in justice and truth. The *publication*, also, of the proceedings of courts of justice, is privileged beyond ordinary communications. *Curry* v. *Walter,* 1 *Esp. Rep.* 456. S. C. 1 *Bos. & Pull.* 525. *Rex.* v. *Wright,* 8 *Term Rep.* 293. But this privilege is still more strictly guarded. Slanderous matter may be justified, by the occasion on which it is uttered, and yet the subsequent publication of that matter may be libellous ; so that a person may be liable for publishing a true and accurate report of what took place. *Rex* v. *Creevy*, 1 *Mau. & Selw.* 273. *Rex* v. *Lord Abingdon,* 1 *Esp. Rep.* 226. But in cases where the publication is justifiable, on the ground that the 'general advantage to the country in having the proceedings made public, more than counterbalances the private injury, the law requires a true and fair account. If the publisher makes any remarks of his own, he is liable in respect of them, precisely in the same manner he would be, if they had no connexion with any privileged publication. And it is not a sufficient justification, that the alleged libel was *in substance* a true account. *Flint* v. *Pike,* 4 *Barn. & Cresw.* 473. *Lewis* v. *Walter,* 4 *Barn. & Ald.* 605. *Duncan* v. *Thwaites & al.* 3 *Barn & Cresw.* 556. *Stiles* v. *Nokes,* 7 *East,* 493. Does it appear from the record, in this case, that the libel complained of, was merely a true and fair report of the case of *Beers* v. *Broome ?*

7. That if the matter in any one of the specifications, is, on

any ground, libellous, and is legally set forth, the judgment will not be reversed; as it will be presumed, that the verdict was given, and the damages assessed, in respect of that matter only. *Wolcott* v. *Coleman*, 2 *Conn. Rep.* 324.

PETERS, J. A libel is a malicious defamation, expressed in print or writing, or by signs or pictures, tending to blacken the memory of the dead, with an intent to provoke the living, or to injure the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule. A vein of irony runs throughout this publication; but understanding it, as the rest of mankind do, (*Rex.* v *Horne, Cowp.* 688.) the whole turn of expression insinuates, that the plaintiff has been guilty of perjury, and renders him ridiculous and contemptible.

The declaration contains ten specifications of libellous matter, with the explanatory innuendoes, which the jury have found to have been made and published, by the defendant, falsely and maliciously, of and concerning the plaintiff, with the meaning and intent alleged in the declaration. If either of these specifications is sufficient, the judgment below must be affirmed.

I lay out of the case the seventh specification, because there is no introductory averment or *colloquium*, to which it refers; and the words do not, in themselves, naturally convey the meaning imputed to them, by the innuendoes. The averment is, that the libel was made and published of and concerning the plaintiff and his testimony in *Beers* v. *Broome*, and not in *Beers* & al. v. *Hawley* & al. *Rex* v. *Horne, Cowp.* 672. *Hawkes* v, *Hawley*, 8 *East*, 427. *Cheetham* v. *Tillotson*, 5 *Johns. Rep.* 430.

The rest of the publication, when stripped of its technical dress, describes the plaintiff as a low Indian-like fellow; contrasts him with Sergeant *Dunning*, a distinguished member of the *English* Bar; nick-names him "Counsellor *Dunning* of *Weewalker*, Sergeant at law;" represents his testimony on said trial, as wrapped in concealment—a fictitious tale, too absurd to be endured—a contrived story—a mere pretence, designed, by its falsehood, to blast the truth, and render infamous the fairest characters in society, and more dangerous than a concealed serpent; stigmatizes the plaintiff as a base villain, and a slavish dependent of the person, for whom he testified,—a mere stupid puppet in his hands, suborned, trained and instructed

*Fairfield,*
*June,*
*1827.*

*Hillhouse*
*v.*
*Dunning.*

how to testify ; represents the plaintiff as prevaricating in his testimony, and wilfully refusing to testify to facts within his knowledge and recollection, under the pretence of forgetfulness.

The law of libel makes a material difference between words *spoken* and words *written.* To be actionable, the former must tend to bring a man into danger of punishment, exclude him from society, or injure him in his occupation ; but it is enough, if the latter induce an ill opinion to be had of the party ; or make him contemptible and ridiculous. *Cropp* v. *Tilney,* 3 *Salk.* 226. *Thorley* v. Lord *Kerry* , 4 *Taun.* 355. And it is sufficient, if the matter be *reflecting ;* as to paint a man playing at cudgels with his wife. *Anon.* 11 *Mod.* 99. So an action has been sustained for maliciously writing and publishing of another, doggerel verses,describing him as stinking of brimstone, and having the itch. *Villers* v. *Monsley,* 2 *Wils.* 403. In that case, *Gould,* J. *inter alia,* said, " for speaking the words *rogue* and *rascal* of any one, an action will not lie ; but if those words were written and published of any one, I doubt not an action would lie. So, the calling of a man a villain, in a letter to a third person, has been holden to be a libel ; and the court were clearly of opinion, that any words written and published, throwing contumely on the party, were actionable. *Bell* v. *Stone,* 1 *Bos.* & *Pull.* 331.

But these cases are " trifles light as air," compared with the publication before us ; which, read with the eyes of common sense, exhibited a gross and infamous libel. What crime is more odious than perjury ? What words can convey a clearer charge af this detestable crime, than to say to a witness sworn to testify the whole truth, your testimony is wrapped in concealment ; your tale is absurd ; you are a mere puppet in the hands of your employer, trained up by him to testify as he directs ; and when cross-examined, you have no answer to give but prevarication and *non mi ricordo.*

The case of *Steele* v. *Southwick,* 9 *Johns. Rep.*214. is so much like this, that it may be said, *mutato nomine, de te fabula narratur.* The defendant printed and published of the plaintiff, a witness in a cause, then lately tried in the supreme court, these words : " Affidavits. Our army swore terribly in *Flanders,* said Uncle *Toby ;* and if *Toby* was here now, he might say the same of some modern swearers. The man at the sign of the Bible, (the plaintiff,) is no slouch at swearing to an old sto-

ry."   These words,  said  the court, import that  the plaintiff
swore with levity, rashly and  inconsiderately,  without due re-
gard  to  the   solemnity  of   the  oath,  or  to  the  truth  or
accuracy  of  what he  said.   If  the words *do not impute per-*
jury, in the legal sense, they  hold  the plaintiff up to contempt
and ridicule, as thoughtless, or  so immoral as to  be regardless
of the obligations becoming a witness, and  therefore, to be ut-
terly unworthy of credit.   In this view, the  words  are action-
able ;  for a writing published maliciously, with  a  view to ex-
pose a person to contempt and ridicule, is undoubtedly action-
able ;  and what was said  to this  effect,  by the  judges  of the
*English* court of *Common Pleas*, in *Villers* v. *Monsley*, is found-
ed in law, justice and sound policy.   In this opinion  I entirely
concur.   The  case before us is *ad idem*, but much  stronger ;
for in this we trace  the marks of the  libeller  in  every line :
*Quia tria sequuntur  defamatorem famosum ; 1.  pravitatis incre-*
*mentum ;  2. bursæ decrementum ;  3.  conscientiæ detrimentum.*
The case *de  libellis  famosis, 5 Rep.* 126.

There is no  error in the judgment complained of.

Hosmer, Ch. J.* and Brainard, J. were of the same opinion.

Lanman, J. dissented ; and Daggett, J. gave no  opinion,
having been of counsel in the cause.

Judgment  affirmed.

* The Chief Justice  expressed his views in an elaborate opinion, which is
omitted, only because its insertion would extend the case to too great a length.